# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF TEXAS
### SAN ANTONIO DIVISION

| | | |
|---|---|---|
| JOAN K. GONZALEZ | § | |
| Plaintiff, | § | |
| v. | § | |
| | § | |
| TEXAS HEALTH AND HUMAN | § | |
| SERVICES COMMISSION, AND | § | Case No. 13-cv-183-DAE |
| EXECUTIVE COMMISSIONER Kyle | § | |
| Janek, M.D. and director Kelly Ford, in their | § | |
| Official Capacities | § | |
| Defendants. | § | |
| | § | |

## PLAINTIFF'S RESPONSE TO DEFENDANT'S
## MOTION FOR SUMMARY JUDGMENT

### Introduction

Plaintiff Joan Gonzalez was employed as a Texas Works Advisor (TWA) at Defendants'

call center in San Antonio, Texas. While working, she became critically ill, came close to death,

had to be hospitalized, and underwent a five-week absence from work. She was diagnosed with

a pulmonary embolism and deep vein thrombosis. Gonzalez was placed on medications,

including blood thinners, to reduce the likelihood of another pulmonary embolism. When

Gonzalez returned to work, she had physical restrictions placed on her by her physician for her

own well-being. These included restrictions on the length of time she could remain sitting,

having to take periodic breaks to walk around, and not working in excess of eight hours per day.

As a result of these restrictions, and wanting very much to remain employed by the State,

Gonzalez sought reasonable accommodations, including periodic breaks and an eight-hour

limitation to her work day. As an alternative, Gonzalez also sought a transfer to another

position, such as to a TWA at one of local field offices (she learned from various sources that

employees in these positions were not required to work overtime), or to any lesser position, including a demotion.

Meanwhile, upon Gonzalez's return to work, supervisor Rex McNiel began to mistreat and undermine her, as will be described in detail below. In the end, Defendants denied Gonzalez's requests for reasonable accommodation and terminated her employment on October 17, 2011. Thereafter, Gonzalez filed an EEOC charge alleging disability discrimination, including failure to provide reasonable accommodation and wrongful termination. After a thorough investigation, including interviewing various witness, the EEOC issued the attached Determination, *See* Exh. 1, concluding that Gonzalez had been the victim of unlawful disability discrimination. Since her discharge from employment, Gonzalez has applied for numerous vacant positions within the Department of Health and Human Services, but on each occasion, her application has been summarily denied.[1]

Defendants now move for summary judgment on Gonzalez's claims, arguing: (1) Gonzalez did not suffer from a disability within the meaning of the Rehabilitation Act; (2) Gonzalez was not a "qualified individual" because she was precluded from working overtime and working overtime was an essential function of TWA positions in the San Antonio call center; and (3) there were no other positions for which Gonzalez was qualified.

These arguments lack merit. First, Defendants misstate the standards for establishing a disability within the meaning of the Rehabilitation Act as it was amended by the ADA Amendments Act, and Gonzalez clearly suffered from a disability within the meaning of the amended law. Second, even assuming for the sake of argument that Gonzalez's restriction from working overtime rendered her unqualified to work as a TWA in the call center, the evidence

---

[1] Gonzalez asserts a claim for retaliation in her lawsuit. However, at this time, she relinquishes this claim. However, Defendants repeated failure to rehire her remains relevant to the issue of Gonzalez's economic damages.

shows that Defendants' human resources department did next to nothing to explore whether Gonzalez could be reasonably accommodated through a transfer to another position that did not involve overtime as an essential functions. In fact, the evidence shows that there were vacancies for other positions, including TWA positions in the local field offices, where working overtime was not an essential job function. By failing to transfer Gonzalez to such a position, Defendants unlawfully failed to reasonably accommodate her. Then, by discharging Gonzalez--purportedly because she could not be accommodated, Defendants again violated the Rehabilitation Act.

## Statement of Facts

Joan Gonzalez commenced employment with the Defendant Department of Health and Human Services as a Texas Works Advisor I (TWA) on January 24, 2011. She commenced training on February 7, 2011 and completed her training on April 13. She was initially assigned to work in the Changes Center department; however, shortly thereafter, Defendant transferred Gonzalez to work in the Women's Health Program (WHP) under supervisor Rex McNiel, who in turn reported to KK Welch, the Program Manager. Gonzalez started work in the WHP on April 18, where she continued to receive on-the-job training Gonzalez Decl., ¶ 1, Exh. 2.

When Gonzalez went to work in the WHD, McNiel explained that she would first have a goal of twenty tasks per day, and then this would be increased to thirty per day and then finally to forty tasks per day. *Id.*, ¶ 2. Tasks include both the processing of applications for benefits as well as changes. Equal credit is given for the completion of applications and changes, even though--generally speaking, applications required more time to complete than did most changes. Unfortunately, for reasons that remain unclear, Defendant did not provide Gonzalez with computer access to programs such as databroker and WTPY that TWAs need to process applications. This lack of access to these essential programs, not surprisingly, forced Gonzalez to have to rely on other TWAs to run searches for her, and this slowed down her production.

Gonzalez repeatedly complained about this, and she did not receive access to these programs until the end of September 2011, approximately two weeks before her termination. Gonzalez Decl., ¶ 2, Exh. 2.

Gonzalez worked diligently in her position. She was repeatedly told by McNiel that she was doing a good job for her experience level. In fact, during the month of May, Gonzalez underwent a random audit and received a 100% accuracy rating. *Id.*, ¶ 3.

During the first week of June 2011, Gonzalez started to feel sick. She noticed that her leg had swelled tremendously. She went to the doctor, but had to see the physician assistant, who diagnosed her with high blood pressure. *Id.*, ¶ 4. Over the next few days, Gonzalez experienced shortness of breath, sweating, and pain in the right lung. Then, while working on June 9, 2011, Gonzalez began to feel extremely ill such that she could no longer work. *Id.; see also* Accident Report, Exh. E to Defs' Mtn. for SJ. She had to leave work and went to Methodist Stone Oak Hospital, where evaluation and testing revealed that she had suffered a life-threatening pulmonary embolism and that she had deep vein thrombosis. A deep vein thrombosis is defined as a blood clot that develops in a deep vein, usually in the leg. Deep vein thrombosis can cause pain in the leg, and can lead to complications if it breaks off and travels in the bloodstream to the lungs. Discharge Summary, Exh. 3. A pulmonary embolism is the sudden blockage of a major blood vessel in the lung, usually by a blood clot that can result in damage to the lung or sudden death. Gonzalez was told that tests revealed that she had multiple blood clots in her right lung and that, had her heart not been as strong as it was, she would have died. Gonzalez Decl., ¶ 4, Exh. 2.

Gonzalez was hospitalized from June 9 through June 14, 2011. She started under the care of Dr. Paley, who prescribed her Norco (for pain), Ibuprofen (anti-inflammatory and anti-

platelet), and Warfarin (also known as Coumadin, an anticoagulant in the prevention of thrombosis and thromboembolism, which she took from June 10, 2011 through January 31, 2012.) Dr. Paley also prescribed compression stockings for Gonzalez to wear for eight weeks. Dr. Paley restricted Gonzalez from working at all until July 14, 2011, when she returned to work. However, Gonzalez returned with the restriction of having to take ten minute breaks every hour so that she could get up every hour and walk around for approximately ten minutes. Physician, Documentation, Exh. P to Defs' Mtn for SJ. In a Fitness for Duty Certification, Dr. Paley also noted that Gonzalez could not work more than eight hours per day and could not participate in overtime hours. Fitness for Duty Certification, Exh. N to Defs' Mtn for SJ. These restrictions remained in place until February 13, 2012. Gonzalez Decl., ¶5 , Exh. 2.

It is undisputed that, immediately upon her return to work, Gonzalez sought reasonable accommodation for her medical condition. Defendants assigned Health and Human Services Commission Civil Rights Specialist Dionicio Garcia to work with Gonzalez in attempting to locate a reasonable accommodation. Although Garcia could recommend that an accommodation be granted, he did not have the authority to grant or deny an accommodation. This power was reserved to management. Garcia Dep. p. 8, Exh. 4. Based on the information provided by Gonzalez's physician, he came to the conclusion that Gonzalez was in fact disabled within the meaning of the Rehabilitation Act. *Id.* at 9-10. According to Garcia, Gonzalez initially requested that she be exempted from overtime work. Garcia made this proposal to management, and initially, McNiel responded that this could be done. *Id.* at 10-11; However, Welch later responded that this was not an option. Garcia Dep. p. 9-11, Exh. 4.

On September 15, Garcia and Gonzalez further conversed by phone regarding Gonzalez's request for reasonable accommodation. Garcia stated that management contended that

Gonzalez's position required her to be able to work overtime, and thus, she could not be accommodated in her position. Because she had learned from co-workers that TWAs at other locations were not required to work overtime as part of their jobs, and that there were many open jobs in the local offices, Gonzalez inquired about transferring to work as a TWA at another location anywhere in San Antonio or immediately surrounding areas. Gonzalez Decl., ¶ 10, Exh. 2. Garcia promised to look into this. He also asked whether Gonzalez would be interested in any other positions, even if it meant a demotion. Gonzalez confirmed that she would be interested in any available position. *Id.* Garcia's recollection of this conversation was similar. Garcia Dep. pp. 16, 17, 37, Exh. 4; Garcia Oct. 4, 2011 Memo, Exh. 6 ("you expressed an interest in transferring into another position similar to yours in the San Antonio area that does not require overtime.").

In an effort to assist Garcia, Gonzalez also looked on the internet for still other vacant positions. She located, for example, a variety of positions that did not appear to require overtime at the UT Health Science Center and forwarded them via email to Garcia. Although these positions were not in the HSSC, Gonzalez was aware that other HSSC employees had transferred between the Health Science Center and the HSSC. Gonzalez Dep. pp. 155-159, Exh. 12. Garcia in turn forwarded them to Welch. Emails regarding UTHSC Positions, Exh. 7.

On the following day, September 16, Garcia consulted HR Specialist Lonnie Bennett, and asked Bennett to look for any position in San Antonio and the surrounding areas--including TWA positions and others--that did not require overtime as an essential job function . Garcia Dep., pp. 18-19, 21, 30-31, Exh. 4. Garcia also memorialized this request to Bennett in writing. *See* Exh. 8. Under Defendants' policies, when a disabled employee requires a transfer as a form of reasonable accommodation, the disabled employee should be awarded a vacant position for

which they are qualified without having to compete for the position with other interested applicants. Garcia Dep., pp. 45-46, Exh. 4. Approximately one week later, Bennett responded that no such positions existed in the San Antonio area. *Id.* at 18-19. Garcia took Bennett at his word, and did not follow up to inquire further. Nor did Garcia talk to anyone else, such as program managers or managers who ran the local centers, about the possibility of transferring Gonzalez, even though he readily admits that there were in fact vacant TWA positions in the field offices. *Id.* at 19, 21, 22.

For his part, Bennett did little to locate an appropriate transfer for Gonzalez. He did not talk to Gonzalez, Bennett Dep. p. 8, Exh. 9, did not look at her personnel file, resume, or application, *id.* at 19, 29-30, and did not speak to anyone whatsoever within the HHSC about whether Gonzalez could work as a TWA or in another position, *id.* at 10-12. What is more, he only looked at positions within San Antonio (not surrounding towns), *id.* at 9; he looked at clerical positions only at the regional office (and not at the local field offices), *id.* at 24; and he did not look at positions within HHSC's sister departments (such as DADS, Dept. of Assistive and Rehabilitative Services, Family Protective Services, and Dept. of Health Services) even though Defendants' HR manual specifically identifies a transfer to one of these departments as a form of reasonable accommodation, *id.* at 33-35, 37.

The sum total of Bennett's efforts was to talk to Garcia to receive his assignment, look on the computer on one particular day in September 2011 to see whether a vacancy existed in HHSC at that time that did not involve working overtime, and then communicate back to Garcia that no vacant positions existed. *Id.* at 41. Bennett could not say whether he even worked more than thirty minutes on the matter. *Id.* at 30. Even though he readily admits that there were vacant TWA positions in the local field offices, Bennett claims he excluded them as well as field

office clerical positions because he believed, based on general conversations with Regional Manager Grace Moser over the years, that TWAs and clerks worked overtime from time to time. *Id.* at 10, 12, 24-25. However, Bennett did not contact Moser regarding the possibility of accommodating Gonzalez, *id.* at 12, did not specifically ask anyone, including Moser, whether working overtime was an essential function of these positions, did not ask whether disabled employees may be exempted from any such requirement, and did not inquire how much overtime, if any, was required in the field offices or whether it varied from office to office. *Id.* at 11, 12, 14-15, 44. Bennett has never worked as a TWA, *id.* at 12, and has no personal knowledge whether TWAs and clerks in the field offices worked overtime or whether overtime was an essential function of these jobs. *Id.* at 13-14, 22-24, 44. In fact, Bennett acknowledges that he did not do anything in connection with Gonzalez's request for reasonable accommodation to determine the essential functions of the TWAs in the field offices. *Id.* at 21.

In retrospect, after comparing the job description for the TWA position in the call center with the separate job description for a TWA in the field offices, *see* Exh. 10 and Exh. 11, Bennett acknowledges that it is "possible" that the absence of any mention of overtime in the field office TWA job description could mean that overtime is not an essential function of that position given that overtime is specifically mentioned in the job description for TWAs in the call center. Bennett Dep. p. 29, Exh. 9.

Nevertheless, on September 27, Bennett did finally communicate back with Garcia that no positions that did not require overtime were available in San Antonio. Garcia then talked to Gonzalez and inquired whether she would be willing to transfer to a position outside San Antonio or surrounding areas. Gonzalez responded that she could not accept a job outside the San Antonio area, but she was willing to accept jobs in adjacent communities (such as Schertz,

Boerne, and New Braunfels). Gonzalez Decl., ¶ 12, Exh. 2. On the following day, September 28, Garcia advised Gonzalez that her request for accommodation was going to be closed because her current position required overtime and no position that did not involve overtime had been located. *Id.*

Undeterred, Gonzalez continued to look on HSSC's available jobs on line. She also had occasion to speak with HSSC Senior Trainer Kathleen Hauert, who advised Gonzalez to put in for a transfer to one of the other San Antonio offices because the TWAs in these other offices were not required to work overtime. Gonzalez Dep. pp. 117-18, 150, 152-54, 162, Exh. 12. Gonzalez was aware that vacancies existed in these locations. Gonzalez Decl., ¶ 13, Exh. 2; Gonzalez Dep. pp. 153, 163, Exh. 12. Although Gonzalez had already made such a request to Garcia to no avail, she followed this advice and made a formal written request for such a transfer to a vacant position at the Schertz, Nacogdoches, or Salado Creek offices by completing the form and sending the request to her supervisor, Rex McNiel, (as was the policy), on the afternoon of October 3. In the Transfer Request, she noted that the reason for the request was "Hardship Transfer Due to Medical Reasons." In fact, she was willing to accept "anything close to San Antonio." *Id. at* 161-64; Transfer Request, Exh. 13. Early the next morning, McNiel responded that he did not "have access to the information and/or programs I need to process this and forward to KK [Welch] while I am in training. I will try, but we may need to wait until I return to process your request." *See* Emails , Exh. 14. Gonzalez was aware that vacancies existed in these locations. Gonzalez Decl., 13, Exh. 2. On October 6, Garcia sent Gonzalez a memo (dated October 4) explaining that her request for accommodation was being denied, and her case was being closed. Gonzalez Dep. p. 181, Exh. 12; Garcia Oct. 4, 2011 Memo, Exh. 6.

On the following day, still searching even more positions, Gonzalez sent McNiel an email stating: "I would appreciate you adding this to my transfer request-the Position #55190 Job Requisition #183399 for Medical Elig. Spec. II (CT) the position is currently open at: (608 Sandau Road, San Antonio, TX)." *See* Exh. 15. Attached to her email was the Transfer Request for this Position. McNiel forwarded this transfer request to Welch as well. Gonzalez believed the position was an ideal fit because the job description posted online made no mention of overtime, she possessed the stated qualifications, and it was clear to Gonzalez that the duties and qualifications for this position were otherwise very similar to the position that she currently held. Gonzalez Decl., ¶ 16, Exh. 2; *see* Med. Elig. Spec. Job Descrip., Exh. 16. Sadly, neither McNiel nor Welch ever got back to Gonzalez regarding the transfer requests. Gonzalez Decl., ¶ 17, Exh. 2. Defendants produced no documentation in this litigation indicating that Gonzalez's transfer requests were ever investigated or acted on.[2]

That McNiel and Welch did not act on the requests for a transfer did not come as a total surprise to Gonzalez. Upon her return from medical leave, Gonzalez noticed a palpable change in the way McNiel treated her. McNiel was responsible for assigning tasks to the TWAs on his team, and Gonzalez and others noticed that Gonzalez's mix of tasks included a higher percentage of applications (as opposed to changes) compared to other employees.[3] This was something that Gonzalez complained about to no avail. Likewise, Gonzalez completed tasks started by others,

---

[2] Regarding the Medical Eligibility Specialist position, *see* Exh. 16, which was one of the positions that Gonzalez located and identified for Garcia as being vacant and which she believed she was qualified to hold, Bennett acknowledges that the job description does not mention working overtime, Bennett Dep. p. 38, Exh. 9, but he has no knowledge of the duties performed by employees in this position, *id.* at 48. Although Bennett claims that he does not recall this position being vacant, the undisputable fact is that it was vacant because Gonzalez found it looking for vacancies online. Gonzalez Decl., ¶ 16, Exh. 2; *see* Exh. U to Defs' Mtn. for SJ.

[3] Applications generally took more time than changes. Hutcheson Dep. p. 25, Exh.18; Green Decl., ¶ 3, Exh. 19; Calvillo Decl., ¶ 3, Exh. 20.

but was not given credit for these tasks even though policy required that credit be given to the person who actually completes the task. Gonzalez repeatedly raised questions about getting proper credit for her work and the inequitable distribution of work to McNiel and to lead Thelma Trevino, who told Gonzalez to "calm down." Still the problem was not corrected. Gonzalez Decl., ¶ 6, Exh. 2.

And when it came to for Gonzalez's six-month review on August 19, 2011, McNiel gave Gonzalez a "needs improvement" for Professionalism. When Gonzalez asked for an explanation, McNiel was forced to admit that this rating was based upon her medical leave without pay. McNiel also marked Gonzalez as needing improvement in the area of "Determining eligibility and amount of benefits" because she had one error out of sixteen cases reviewed even though he noted that her performance in this area 'is commensurate with her tenure." McNiel rated Gonzalez as needing improvement in the areas of Initiative, Planning and Organization, and Decision-Making but when she asked him for explanation, he could provide her with no examples of mistakes, errors, or specific performance deficiencies. McNiel was forced, however, to give Gonzalez an overall rating of Competent. Gonzalez Decl., ¶ 7, Exh. 2; Performance Evaluation, Exh. 17. Equally troubling was McNiel's continued refusal--for no apparent reason--to provide Gonzalez with her own access to the Databroker and WTPY data bases which she needed to perform her job until amost two weeks before her termination. This required her to ask other TWAs to stop what they were doing and run the searches for her. In a business where employees are expected to complete tasks in a matter of minutes, this slowed productivity. Gonzalez Decl., ¶ 9, Exh. 2; Hutcheson Dep. p. 26, Exh. 18; Green Decl., ¶ 3, Exh. 19. Finally, when Gonzalez first joined the group, McNiel told her that, for new hires, the expected number of completed daily task quota is gradually increased from 20 per day to 30 per

day and finally to 40 per day. To Gonzalez's surprise, on September 16, 2011, McNiel increased her production quota from twenty directly to forty. *Id*; McNiel Memo, Exh. 21. Apparently, McNiel's unfair treatment of Gonzalez did not escape the attention of other employees. During the EEOC charge investigation, the EEOC interviewed employee Debra Calvillo, who explained that, upon Gonzalez's return from medical leave, "it seemed like the supervisors were treating her more harshly than other employees." EEOC Witness Interview, Exh. 22.

The *coup de grace* came on October 17, 2011, when Defendants discharged Gonzalez from employment because she allegedly could not perform the essential function of working overtime. Although Defendants have suggested in this litigation that Gonzalez was a poor performer and that this alleged poor performance played a role in the discharge decision, the fact is that the contemporaneous reason for discharge was her inability to work overtime. This fact is proven by Defendants own Chronology, *see* Chron, Exh. 23 ("Ms. Welch requested a dismissal because Ms. Gonzalez cannot perform the essential functions of the job with or without a reasonable accommodation;" "Ms. Gonzalez cannot work the mandatory overtime required to perform the necessary work. Therefore, her work has to be done by someone else."), as well as by the Termination Memo from Welch to Regional Director Kelly Ford, Exh. 24 (discussing that Gonzalez's request for accommodation had been denied, that Gonzalez could not perform the essential functions of the job, and that Gonzalez was discharged because she was not "suitable" for the position). On the day of her termination, Gonzalez had checked her own performance against another employee (Tonya), who joined the department around the same time as Gonzalez. While Gonzalez work on that day consisted of 75% applications and only 25% changes, Tonya's work was 75% changes and 25% applications. Gonzalez Decl., ¶ 18, Exh. 2.

The notion that Gonzalez's performance was lacking is also disproven by the fact that after she was finally provided access to Data Broker, she was able to meet her increased quota. *Id.*, ¶ 19.

After her discharge, Gonzalez filed an EEOC charge. The EEOC issued a Determination that Gonzalez had been the victim of unlawful disability discrimination. The EEOC concluded in part that Defendants failed to reasonably accommodate Gonzalez by transferring to another location, as the evidence showed that TWAs at these other locations were not required to work overtime. EEOC Determination, Exh. 1.

**Arguments and Authorities**

**Gonzalez Suffered from a "Disability"**

Defendants first contend that Gonzalez does not suffer from a disability within the meaning of the law. Defendants' argument represents an about face from their prior position, taken during the reasonable accommodation interactive process, that Gonzalez did in fact suffer from a disability. Garcia Dep. pp. 9-10, Exh. 4. Defendants' argument is also remarkable in that it relies entirely on pre-ADAAA case law interpreting the meaning of "substantially limited" and "major life activities." Defendants surprisingly fail to advise the Court, however, that these cases have no bearing on this litigation because the definitions of "major life activities" and "substantially' limited in Section 504 of the Rehabilitation Act were amended effective January 1, 2009 by virtue of conformity amendments contained in the ADA Amendments Act. Thus, while the cases cited by Defendants may be interesting legal history, they are irrelevant to this case because they are not good law for claims that arise after January 1, 2009.

Section 7 of the ADA Amendments Act provides that "Section 7 of the Rehabilitation Act of 1973 (29 U.S.C. Section 705) is amended—(1) in paragraph 9(B), by striking 'a physical' and all that follows through 'major life activities,' and inserting 'the meaning given it in Section 3 of the Americans with Disabilities Act of 1990 (42 U.S.C. Section 12102'; and (2) in

paragraph 20(B0, by striking 'any person who' and all that follows through the period at the end, and inserting 'any person who has a disability as defined in section 3 of the Americans with Disabilities Act of 1990 (42 U.S.C. Section 12102).'" Thus, the sweeping changes to the ADA occasioned by the ADA Amendments Act of 2008 also apply to Section 504 of the Rehabilitation Act. *E.g., Akerson v. Pritzker*, 2013 WL 5946505, *8 (D. Mass. 2013) ("The 2008 ADA Amendments Act ("ADAAA"), which contains a conformity provision for the Rehabilitation Act, provides guidance for courts assessing whether a plaintiff is disabled [under the Rehab Act.")

Under the amended ADA, and therefore under Section 504 of the Rehabilitation Act, "[t]he definition of disability ... shall be construed in favor of broad coverage of individuals ... to the maximum extent permitted by the [Amendments]." 42 U.S.C. § 12102(4)(A). Indeed, "the primary purpose of the ADAAA is to make it easier for people with disabilities to obtain protection under the ADA." 29 C.F.R. § 1630.1(c)(4). The stated purpose of the ADA Amendments Act was to overrule the restrictive approaches favored by cases such as *Sutton v. United Airlines,* cited by Defendants, as well as *Toyota Motor Manufacturing v. Williams*, on which other cases cited by Defendants rely. ADA Amendments Act, Sec. 2.

An impairment is a disability within the meaning of the Rehabilitation Act if it "substantially limits the ability of an individual to perform a major life activity as compared to most people in the general population." 29 C.F.R. § 1630.2(j)(1). Pursuant to the ADA Amendments Act, the EEOC has promulgated regulations further explaining the meaning of "substantially limited."

> (1) *Rules of construction.* The following rules of construction apply when determining whether an impairment substantially limits an individual in a major life activity:

(i)     The term "substantially limits" shall be construed broadly in favor of expansive coverage, to the maximum extent permitted by the terms of the ADA. "Substantially limits" is not meant to be a demanding standard.

(ii)    An impairment is a disability within the meaning of this section if it substantially limits the ability of an individual to perform a major life activity as compared to most people in the general population. An impairment need not prevent, or significantly or severely restrict, the individual from performing a major life activity in order to be considered substantially limiting. Nonetheless, not every impairment will constitute a disability within the meaning of this section.

(iii)   The primary object of attention in cases brought under the ADA should be whether covered entities have complied with their obligations and whether discrimination has occurred, not whether an individual's impairment substantially limits a major life activity. Accordingly, the threshold issue of whether an impairment "substantially limits" a major life activity should not demand extensive analysis.

(iv)    The determination of whether an impairment substantially limits a major life activity requires an individualized assessment. However, in making this assessment, the term "substantially limits" shall be interpreted and applied to require a degree of functional limitation that is lower than the standard for "substantially limits" applied prior to the ADAAA.

(v)     The comparison of an individual's performance of a major life activity to the performance of the same major life activity by most people in the general population usually will not require scientific, medical, or statistical analysis. Nothing in this paragraph is intended, however, to prohibit the presentation of scientific, medical, or statistical evidence to make such a comparison where appropriate.

(vi)    The determination of whether an impairment substantially limits a major life activity shall be made without regard to the ameliorative effects of mitigating measures. However, the ameliorative effects of ordinary eyeglasses or contact lenses shall be considered in determining whether an impairment substantially limits a major life activity.

(vii)   An impairment that is episodic or in remission is a disability if it would substantially limit a major life activity when active.

(viii)  An impairment that substantially limits one major life activity need not substantially limit other major life activities in order to be considered a substantially limiting impairment.

(ix)    The six-month "transitory" part of the "transitory and minor" exception to "regarded as" coverage in § 1630.15(f) does not apply to the definition of "disability" under paragraphs (g)(1)(i) (the "actual disability" prong) or

(g)(1)(ii) (the "record of" prong) of this section. The effects of an impairment lasting or expected to last fewer than six months can be substantially limiting within the meaning of this section.

In keeping with the remedial purposes of the ADA Amendments Act, there are other substantial changes in the relevant definitions that expand the scope of the Rehabilitation Act's coverage and bear on this case. For one, in addition to identifying major life activities such as caring for oneself, performing manual tasks, seeing, hearing, eating, sleeping, walking, standing, lifting, bending, speaking breathing, learning, reading, concentrating, thinking, communicating, and working, 42 U.S.C. Section 12102(2)(A), the statute also now includes the operation of a major bodily functions as major life activities. These include, but are not limited to, "functions of the immune system, normal cell growth, digestive, bowel, bladder, neurological, brain, respiratory, circulatory, endocrine, and reproductive functions." 42 U.S.C. Section 12102(2)(B). Likewise, "an impairment that substantially limits one major life activity need not limit other major life activities in order to be considered a disability."

Similarly, "[a]n impairment that is episodic or in remission is a disability if it would substantially limit a major life activity when active." 42 U.S.C. Section 12102(4)(D). Finally, and significant to this case, "[t]he determination of whether an impairment substantially limits a major life activity shall be made without regard to the ameliorative effects of mitigating measures such as—medication, medical supplies, or appliances . . . ." 42 U.S.C. Section 12102(4)(E).

In this case, Defendants rely entirely upon pre-ADAAA cases to argue that Gonzalez is not/was not substantially limited in the major life activities of sitting and working. For instance, each and every case that Defendants rely upon to argue that the inability to work overtime does not constitute a substantial limitation is a pre-ADAAA case.

In fact, however, under the post-ADAAA standards that this Court must apply, Gonzalez is substantially limited in the major life activity of sitting and in the operation of her circulatory and cardiovascular systems. This is because she could not sit for more than an hour at a time without taking a ten minute break; she could not work overtime; she suffered from deep vein thrombosis; she suffered a pulmonary embolism that resulted in her hospitalization and a five week medical leave from work; and she had to take anti-coagulant drugs, without which she was at a very high risk for continued deep vein thrombosis and another pulmonary embolism, which could have been deadly. *See, e.g., Dewitz v. Teleguam Holdings, LLC*, 2014 WL 1410156, *8 (D. Guam 2014) (holding that issues of material fact existed as to whether employee was substantially limited in the major life activities of sitting and standing where employee was under restrictions from physician to refrain from prolonged sitting and prolonged standing); *Molina v. DSI-Renal, Inc.*, 840 F. Supp.2d 984, 994-96 (W.D. Tex. 2012) (holding that, under the standards of the ADAAA, issues of material fact exist as to whether employee was substantially limited in major life activities of sitting, standing, and sleeping where employee offered evidence that she had episodic pain in her back, thigh, and leg such that she had to get up and stretch, had to take pain medications to relieve the pain, and on one occasion, had to leave the office due to pain even though employee learned to deal with pain and pain did not affect employee's ability to perform daily activities); *see also Fleck v. WILMAC Corp.*, 2011 WL 1899198, *5 (E.D. Pa. 2011) (in ADAAA case, employee's allegation of disability was sufficient where she alleged that she was substantially limited in major life activities of standing and walking where she was unable to stand more than an hour, unable to walk more than a mile, had to use a cam boot to walk or stand, and that her physician's post-surgery recommendation was that she seek a part-time work schedule or additional breaks).

Likewise, Gonzalez has offered sufficient evidence to establish that she is substantially limited in the major life activity of working. This is because she had to take a medical leave of more than five weeks, and when she returned she had to take breaks to walk around and was restricted from working more than eight hours per day for more than seven months. *Wirey v. Richland Comm. College*, 913 F. Supp.2d 633, 641-42(C.D. Ill. 2012) (holding that, under the standards of the ADAAA, employee offered sufficient evidence to establish that she was substantially limited in the major life activity of working where her chronic fatigue syndrome made it difficult for her to concentrate and remain awake at times even though she never took leave due to her condition); *Butler v. BTC Foods, Inc.*, 2014 WL 336639, *4 (E.D. Pa. 2014) (In post ADAAA case, issue of material fact existed as to whether employee was substantially limited in working where, as result of a hernia, plaintiff suffered pain and had difficulty with both bending and lifting); *Heatherly v. Portillo's Hot Dogs, Inc.*, 958 F. Supp.2d 913, 920-21 (N.D. Ill. 2013) (In ADAAA case, holding that, even though impairments lasted less than six months, employee with high-risk and complicated pregnancy created fact issue as to whether she was substantially limited in major life activities of working and lifting where she was restricted from working more than 6-8 hour days and could not lift heavy objects).

In light of Gonzalez's testimony as well as the Congressional mandate that "the definition of disability" be construed "in favor of broad coverage of individuals . . . to the maximum extent permitted by the terms of [the ADAAA]," *Carbaugh v. Unisoft Intl., Inc.*, 2011 WL 5553724, *7 (S.D. Tex. 2011) (quoting 42 U.S.C. Section 12102(4)(A) and holding that employee with episodic multiple sclerosis may be substantially limited in major life activity of working based on employee's own testimony that he had relapses approximately four times per year, each of

which required five days off for in-home intravenous steroid treatments), the Court should deny Defendants' Motion on the ground that Gonzalez is not disabled.

**Gonzalez as a "Qualified Individual"**

Defendants next argue that, even if Gonzalez had a disability within the meaning of the law, she still was not a "qualified individual" because she could not perform the alleged essential function of working overtime. Defendants further note that any accommodation that would have eliminated this essential function would be per se unreasonable. Even assuming this is true, it is hardly an end to the inquiry.

Under both the ADA and the Rehabilitation Act, a "qualified individual" is an individual who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds *or desires*." 42 U.S.C. Section 12111(8) (emphasis added). "Reasonable accommodation," in turn, may include "job restructuring, part-time or modified work schedules, *reassignment to a vacant position*, acquisition or modification of equipment or devices, appropriate adjustment or modifications of examinations . . . and other similar accommodations for individuals with disabilities. 42 U.S.C. Section 12111(9)(B) (emphasis added); *e.g., Davoll v. Webb*, 194 F.3d 1116, 1132 (10th Cir. 1999); *Smith v. Midland Brake, Inc.*, 180 F.3d 1154, 1162 (10th Cir. 1999)(collecting cases).[4]

In this case, Gonzalez specifically and repeatedly requested a transfer to any available position in the San Antonio area, and she identified, and requested a transfer to, positions such as TWA in a local office, clerk in a local office, and Medical Eligibility Specialist. There is no

---

[4] The standards used to determine whether Section 504 of the Rehabilitation Act has been violated in a complaint alleging employment discrimination shall be the standards applied under Title I of the ADA. *Duncan v. Univ. of Tex. Health Science Ctr.*, 469 Fed. Appx. 364, 368 n.6 (5th Cir. 2012) (unpublished); *EEOC v. Amego, Inc.*, 110 F.3d 135, 143 (1st Cir. 1997); *Myers v. Hose*, 50 F.3d 278, 281 (4th Cir. 1995).

dispute that these positions were available, and that if Gonzalez was qualified to perform any one of them, then she should have been transferred.

Defendants' sole argument--at least with respect to TWA and clerk positions in the field offices--is that such a reassignment would not have been effective because these positions also include mandatory overtime as an essential job function. Essential job functions are the fundamental job duties of the employment position the individual with a disability holds or desires. The term does not include the marginal functions of the position. A job function may be considered essential because

(1) the position exists to perform the function,

(2) a limited number of employees are available that can perform it,

(3) the position is highly specialized;

(4) the employer's judgment as to what functions are essential;

(5) the written job description for the position;

(6) the amount of time spent on performing the function;

(7) the consequences of not requiring the incumbent to perform the function;

(8) the terms of a collective bargaining agreement;

(9) the work experience of past incumbents; and

(10) the current work experience of incumbents in similar jobs.

*E.g., Rorrer v. City of Stow*, 743 F.3d 1025, 1039 (6th Cir. 2014) (citing various cases and 29 CFR 1630.2(n)(1). Whether a job function is essential is a question of fact that is typically not suitable for resolution on summary judgment. *Id.* (citing *Keith v. County of Oakland*, 703 F.3d 918, 926 (6th Cir. 2013)). Moreover, at the summary judgment stage, the employer's judgment

will not be dispositive on whether a function is essential when evidence on the issue is mixed. *Rorrer*, 743 F.3d at 1039. (citing *Feldman v. Olin Corp.*, 692 F.3d 748, 755 (7th Cir. 2012)).

To support their argument that overtime is an essential function in the field offices, Defendants rely solely on the declaration testimony of Grace Moser. As an initial matter, Gonzalez objects to the submission of Moser's declaration testimony because Defendants did not disclose Moser as a person with knowledge of relevant facts in their Initial Disclosures or otherwise. *See* Exh. 25. In fact, the first and only mention of Moser came in the May 30, 2014 deposition of HR Representative Lonnie Bennett, who when questioned regarding why he failed to consider Gonzalez for any number of available TWA positions in the San Antonio area field offices, stated that he believed that these positions required overtime based on his prior dealings with Moser, even though he never consulted with her regarding the possibility of transferring Gonzalez to one of these available positions. *See* Bennett Dep. pp. 10-12, Exh. 9. However, this deposition occurred after the close of discovery and just five days before the dispositive motion deadline. Thus, Gonzalez had no opportunity to depose Moser.

What is more, on March 3, 2014, the undersigned counsel sent Defendants' counsel a letter requesting the opportunity to depose a representative who could testify regarding, among other topics, the efforts to accommodate Gonzalez, the feasibility of transferring Gonzalez to a TWA position at another location in the San Antonio Metropolitan Area. *See* Exh. 26. Defendants' counsel responded via email on April 4, 2014 by identifying Dionicio Garcia and Lonnie Bennett on the topic of reasonable accommodation. Defendants never identified Moser. Exh. 27.

Federal Rule of Civil Procedure 37 mandates that undisclosed witnesses be excluded unless the failure to disclose was substantially justified or harmless. Fed. R. Civ. P. 37(c)(1).

The federal courts routinely exclude witnesses under this standard and have held that the failure to timely disclose witnesses is not harmless when the failure precludes the opposing party from deposing the non-disclosed witness. *E.g., Fleming v. City of Selma*, 2013 WL 6002223, *1 (W.D. Tex., Nov. 12, 2013) (Rodriguez, J.). This is certainly the case here. Moreover, there can be no argument that the failure to disclose Moser was substantially justified, as Gonzalez has made it clear from the inception of this case and through discovery that she believed one available accommodation was a transfer to a TWA position in a local field office. *See* Plaintiff's Orig. Comp., ¶¶ 7, 8, and 9.

The same must be said of the reference to a 2010 memorandum that purportedly states that TWAs in the local offices must be "willing" to work overtime. The courts exclude undisclosed documents under Rule 37(c)(3) when the failure to disclose is not harmless. *Fleming*, 2013 WL 6002223, *1. In evaluating whether a discovery violation is harmless, the courts evaluate four factors: "(1) the importance of the evidence; (2) the prejudice to the opposing party of including the evidence; (3) the possibility of curing such prejudice by granting a continuance; and (4) the explanation for the party's failure to disclose."

In this case, the memorandum could be important because it arguably goes to whether TWAs in the field offices are expected to work overtime. Gonzalez is severely prejudiced by Defendants' failure to produce the memorandum for exactly the same reason. Although the court could conceivably grant a continuance, this too would prejudice Gonzalez because this matter has been pending for almost three years (when one considers both the time the case was pending at the EEOC and in the Court), and Gonzalez remains unemployed despite her enormous efforts to find employment. Lastly, there is no valid reason for Defendants' failure to disclose the memorandum since Defendants have known for years that Gonzalez's position has been that

she should have been transferred to a position in one of the local field offices. Defendants had an obligation to produce these documents under Federal Rule of Civil Procedure 26(a)(1)(A). Additionally, Gonzalez's document requests encompassed the referenced memorandum. *See* Request Nos. 10, 11, 12, 16, 25 & 34 in Plaintiff's First Request for Production, Exh. 28.

The objections to Moser's declaration testimony aside, it is telling that Moser offers no testimony regarding the frequency or amount of overtime that these field office employees work, and what percentage of this is/was actually required by management.

By contrast, in the above Statement of Facts, Gonzalez has offered competent evidence that: working overtime hours was not in fact an essential function of the TWA and clerical positions in the local field offices or of the Medical Eligibility Specialist position, that such positions (in fact many such positions) were available in the San Antonio area, that, even though not technically required under the applicable law, Gonzalez specifically sought a transfer to these positions, that Defendants' HR policy was that a disabled employee in need of a transfer as a form of reasonable accommodation was to be provided with the transfer provided the employee was qualified for the vacant position, and that, despite all this, HR Representative Lonnie Bennett hardly considered transferring Gonzalez to one of these available positions.

It is also highly significant that the job descriptions produced by Defendants for the TWA positions in the local field offices make no mention of overtime whatsoever, *see* Exh. 11, because the courts hold that the relevant job description shall be considered evidence of the essential functions of the job. *E.g., Lucas v. W.W. Grainger, Inc.*, 257 F.3d 1249, 1258 (11th Cir. 2001). By contrast, the job descriptions produced by Defendants for the TWA positions in the "call center" where Gonzalez worked do mention the possibility of working overtime, albeit not in the section entitled "Essential Job Functions." *See* Exh. 10. Defendants' selective inclusion

of an overtime requirement in call center job descriptions but not in the field offices job descriptions is evidence that Defendants did not view working as an essential job function for TWAs in the local field offices. *See Feldman*, 692 F.3d at 755-56; *Skerski v. Time Warner Cable Co.*, 257 F.3d 273, 280 (3d Cir. 2001) (fact issue existed regarding whether climbing was an essential function where the job descriptions mention climbing, but no among the list of essential functions); *Cairo v. Starbucks Corp.*, 2013 WL 5229968, *9 (D. Mass. 2013) (Noting, in the context of denying defendant's motion for summary judgment on ground that employee was not "qualified" because he could not meet the alleged essential function of being able to work opening and closing shifts, that the relevant job description nowhere identifies the need to work certain shifts); *Ward v. Vilsak*, 2011 WL 6026124, *10 (E.D. Cal. 2011) ("'there is no mention in the job description that requires employee to have excellent hearing or that states that they would be working alone.' Although consideration is given to the employer's view as to the essential job functions, without more this order cannot conclusively decide whether the three duties stated above were necessarily 'essential' job functions."); *Puckett v. Park Place Entertainment Corp.*, 2006 WL 696180, *6 (D. Nev. 2006) ("we find that [the job duty's] conspicuous absence from the list of essential job functions raises at least a genuine issue of material fact that the activity is not an essential function, but rather is the sort of job duty that could be altered under the ADA").

Second, even putting aside for the moment the total absence of any mention of overtime in the relevant job description, the job description is not the end of the inquiry. *EEOC v. AT & T Mobility Servs.*, 2011 WL 6309449, *7 (E.D. Mich. 2011) ("An inquiry into whether a particular duty is an 'essential function' of the job should be based on more than statements in a job description.").

In this case, there is testimony from individuals with personal knowledge that TWAs in the local field offices were not actually required or mandated to work overtime. For one, the parties in this case deposed TWA Marcellus Hutcheson, who had worked as a TWA at the call center with Gonzalez, but prior to Gonzalez's termination, transferred to a TWA position at the Schertz location (one of the locations where Gonzalez asked to be transferred to), where he still works today. He advised Gonzalez that overtime was not mandated at the Schertz location. Gonzalez Dep. pp. 152-54, Exh. 12.

At his deposition, Hutcheson was understandably reluctant to get involved in this litigation, but he did testify that overtime was not "required" and that he works from 8:00 am to 5:00 pm with a one-hour lunch. He normally completes his caseload by 3:30 or 4:00pm, and then spends an hour doing administrative work. When asked whether he ever stayed late, he said it was "rare." He further testified that, in two-and-a-half years at the Schertz location, he has worked only two Saturdays, and those were not mandatory. Hutcheson Dep. pp. 8-9, 15-16, Exh. 18.

Likewise, another of Gonzalez's co-workers, Debra Calvillo, has provided a sworn declaration that she has personal knowledge of a TWA at one of the San Antonio local field offices that never works overtime. As she notes in her declaration, she would not identify the name of this individual in her declaration for fear that this current employee would be retaliated against. Calvillo Decl., ¶ 5, Exh. 20. Similarly, Sommer Green, another of Gonzalez's former co-workers in the call center, states that it was well known that employees in the field offices did not work overtime or worked very little overtime. Green Decl., ¶ 2, Exh. 19.

Of course, after an extensive investigation, the EEOC also determined that Defendants could have reasonably accommodated Gonzalez by transferring her to another location because

the evidence showed that employees in those locations were not required to work overtime. "Rather, the evidence shows that Respondent allowed Charging Party to work only eight-hour days as requested for a three-month period, and employees with the same job title as Charging Party who worked at Respondent's other area work locations were not required to work mandatory overtime. The evidence also shows that Charging Party was discharged because she was not able to work beyond an eight hour day." EEOC Determination, Exh. 1; *see Goldsmith v. Bagby Elevator Co., Inc.*, 513 F.3d 1261, 1288 (11th Cir. 2008) (affirming district court's admission of EEOC determination in jury trial and stating that EEOC determination is generally admissible, and whether it may be exclude under Evidence Rules 403 or 803(8)(C) is left to the sound discretion of the district court); *Smith v. Universal Servs., Inc.*, 454 F.2d 154, 157-158 (rejecting employer's relevance, prejudicial, and hearsay objections to admission of EEOC fact-finding report that concluded employee was unlawfully discriminated against and affirming admission of report into evidence in district court); *Plummer v. Western Int'l Hotels Co., Inc.*, 656 F.2d 502, 505 (9th Cir. 1981) (citing various cases for proposition that an EEOC determination is a "highly probative evaluation of an individual's discrimination complaint.").[5]

Regarding the Medical Eligibility Specialist position available at the Sandau Road location (and perhaps at other locations), Defendants have offered no explanation for why they did not transfer Gonzalez to this position or even consider her for the vacancy. In fact, as noted by Gonzalez, Defendants never even gave Gonzalez the courtesy of a response (regarding this position or even the TWA positions at Schertz, Nacogdoches, and Salado Creek) even though

---

[5] It is also worth noting, as testified by Gonzalez in her declaration, that a Senior Trainer employed by Defendant and responsible for training TWAs advised her to apply for a transfer to a local office because those TWAs did not work overtime. Likewise, Gonzalez has also been in contact with still another former co-worker who advised that she had transferred to a local office and that she did not work any overtime. Unfortunately, this employee was unwilling to be identified at this stage of the litigation and would not provide a declaration without her supervisor's approval. Gonzalez Decl., ¶ 9., Exh. 2.

she formally sought the transfer some twelve days before her termination.[6] Gonzalez has testified that she met all of the qualifications for the position based on the job description, and the job description made no mention of overtime. Gonzalez Decl., ¶ 16, Exh. 2. Nor could Bennett provide any explanation for why he did not consider Gonzalez for this position, as he simply did not remember it. Bennett Dep. p. 48, Exh. 9. Even if this position did not open up until after Bennett allegedly looked on the database on a single, brief occasion in late September, Defendants offer no explanation why Bennett did not continue looking for available positions up until the day of Gonzalez's discharge. After all, Bennett did testify that there were administrative positions in the San Antonio area that did not require overtime and for which he believed Gonzalez would have been qualified, but none were vacant at the time. *Id.* at 24, 49.

This being the case, it is inexcusable that Bennett did not continue to look to see if any vacancies emerged up until the day of termination. Bennett's decision to limit his search to only one day (as opposed to up until the time Gonzalez was actually terminated) as well his failure to look into available positions in the sister departments (even though HR policy allowed transfers between departments as a form of reasonable accommodation) raise further questions about the bona fides of Defendants' efforts to reasonably accommodate Gonzalez in the first place. *See Monette v. Elec. Data Sys. Corp.*, 90 F.3d 1173, 1187 (6th Cir.1996) ("If, perhaps, an employer *knows* that a position for which the disabled applicant is qualified will become vacant in a short period of time, the employer may be required to offer the position to the employee."); *Dark v. Curry County*, 451 F.3d 1078, 1089 (9th Cir. 2006) (the duty to accommodate is a continuing duty that is not exhausted by one effort, so employer must consider not only those positions

---

[6] This treatment of Gonzalez by McNiel and Welch must be contrasted to the way that Marcellus Hutcheson was treated by the same managers. When Hutcheson sought a transfer from the call center to the Schertz location because it was closer to home, this request was granted. Hutcheson Dep. p. 10, Exh. 18.

contemporaneously available but also those will become available in reasonable amount of time); *see* EEOC Guidance, at 39 ("Vacant' means that the position is available when the employee asks for reasonable accommodation, or that the employer *knows* that it will become available within a reasonable amount of time.").

For all these reasons, material issues of fact exist regarding whether Gonzalez could have been transferred to another vacant position for which she was qualified. As such, there are triable issues of material fact regarding whether Gonzalez was a qualified individual for a position or positions she desired. For essentially the same reasons, there are important issues of material fact regarding whether Defendants could have reasonably accommodated Gonzalez. Therefore, Defendants' Motion for Summary Judgment must be denied.

## Conclusion and Prayer

Plaintiff Joan Gonzalez prays that the Court deny Defendants' Motion for Summary Judgment. Plaintiff Gonzalez also prays for all other relief to which she is entitled.

Dated this the 18th day of June, 2014.

Respectfully submitted,


/S/ Michael V. Galo, Jr.
Michael V. Galo, Jr.
State Bar No. 00790734
Galo Law Firm, P.C.
4230 Gardendale, Bldg. 401
San Antonio, Texas  78229
Telephone -- 210.616.9800
Facsimile -- 210.616.9898

Attorneys for Plaintiff
Joan Gonzalez

<u>CERTIFICATE OF SERVICE</u>

    I certify that a copy of the foregoing document has been served on counsel of record electronically on this 18th day of June, 2014, as follows:

    GREG ABBOTT Attorney General of Texas
    DANIEL T. HODGE
    First Assistant Attorney General
    DAVID C. MATTAX
    Director of Defense Litigation
    JAMES "BEAU" ECCLES
    Chief - General Litigation Division
    MARC RIETVELT Attorney-in-Charge
    Assistant Attorney General
    Office of the Attorney General
    General Litigation Division - 019
    P.O. Box 12548
    Capitol Station Austin, Texas

                /S/ Michael V. Galo, Jr.
                Michael V. Galo, Jr.